## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO

MLO Properties, LLC,                                    Case No. 1:19cv1226

                            Plaintiff,

           -vs-                                         JUDGE PAMELA A. BARKER

City of Cleveland,
                                                        MEMORANDUM OPINION & ORDER
                            Defendant

     Currently pending is Defendant City of Cleveland's Motion for Summary Judgment.  (Doc. No. 56.)  Plaintiff MLO Properties, LLC filed a Brief in Opposition to Defendant's Motion on May 21, 2021, to which Defendant replied on June 9, 2021.  (Doc. Nos. 63, 65.)  Plaintiff was thereafter granted leave to file a Supplemental Response, to which Defendant was granted leave to respond. (Doc. Nos. 68, 80.)  For the following reasons, Defendant's Motion for Summary Judgment (Doc. No. 56) is GRANTED.

## I.    Facts

     Plaintiff MLO Properties, LLC (hereinafter "Plaintiff" or "MLO") is an Ohio limited liability company whose members are Harold LaPine and Benjamin Cappadora.   (Deposition of H. LaPine (Doc. No. 52-1) at Tr. 6.)  MLO acquired three undeveloped, adjoining parcels of property from Mr.

LaPine (acting as Trustee of certain Trusts) in 2019.[1]  *See* Doc. Nos. 56-2, 56-3.  These three parcels (hereinafter referred to collectively as "the Property") are located at the northwest corner of Ontario Street and Carnegie Avenue, directly across from Progressive Field in downtown Cleveland, Ohio. (Decl. of Robert Mavec (Doc. No. 56-1) at ¶ 4.)  They are identified by the Cuyahoga County Auditor as having permanent parcel numbers 101-31-009, 101-31-014, and 101-31-015.  (*Id*. at ¶¶ 4,5.)

Prior to 2012, the easterly boundaries of each of the three parcels comprising the Property directly abutted Ontario Street, which was (at that time) a vehicular roadway.  (Oct. 30, 2019 Deposition of Robert Mavec (Doc. No. 25-4) at Tr. 46.)  Specifically, Robert Mavec (the Commissioner of the Division of Traffic Engineering for Defendant City of Cleveland) explained that, prior to 2012, the portion of Ontario Street abutting the Property formed part of a right-hand turn lane used by motorists turning onto Carnegie Avenue from Ontario Street.  (Doc. No. 56-1 at ¶ 7.) *See also* October 15, 2020 Deposition of David Lastovka (Doc. No. 51-1) at Tr. 11-12.  Thus, prior to 2012, one could operate a motor vehicle southbound on Ontario Street directly next to the Property, along the length of the three parcels' easterly boundaries.  It is undisputed, however, that there was no "curb cut"[2] or driveway access directly from the Property onto Ontario Street.  *See* May 12, 2021 Deposition of David Lastovka (Doc. No. 78-1) at Tr. 57.  In other words, prior to 2012, there were no existing means by which a vehicle could drive directly from Ontario onto the Property or vice

---

[1] Mr. Cappadora testified that he and Mr. LaPine have had ownership interests in these three parcels of property since approximately 1997.  (Deposition of Benjamin Cappadora (Doc. No. 54-1) at Tr. 7-8.)

[2] A curb cut is an opening in the curb created to allow a driveway or a right of way to enter from the street.  *See* Oct. 30, 2019 Mavec Depo. (Doc. No. 25-4) at Tr. 43; Declaration of LaRhonda Talton (Doc. No. 56-9) at ¶ 3.  A person who wishes to obtain a curb cut in order to access real property by motor vehicle must submit a completed "Street Opening and/or Sidewalk Obstruction Permit Application" and receive approval from the City of Cleveland.  (Talton Declaration (Doc. No. 56-9) at ¶ 5.)  According to Defendant's records, neither MLO nor its predecessors in interest applied for a permit to obtain a curb cut for access from the Property to Ontario when it was a vehicular roadway.  (*Id*. at ¶¶ 6,7.)

versa.[3]  (Oct. 30, 2019 Mavec Depo. (Doc. No. 25-4) at Tr. 46; May 12, 2021 Lastovka Depo. (Doc. No. 78-1) at Tr. 57.)

The configuration of the intersection of Ontario Street and Carnegie Avenue changed, however, as part of the Innerbelt Bridge Project.[4]  The Ohio Department of Transportation ("ODOT") began studying the feasibility of the Innerbelt Bridge Project in 2000 and announced plans to begin construction in the spring of 2009.  (Declaration of David Lastovka (Doc. No. 56-6) at ¶ 5; Oct. 15, 2020 Lastovka Depo. (Doc. No. 51-1) at Tr. 7.)  In April 2009, ODOT conducted a public hearing regarding the draft environmental impact statement for the Project, copies of which were circulated to attendees.  (May 12, 2021 Lastovka Depo. (Doc. No. 78-1) at Tr. 50.)  Several months later, in June 2009, the City of Cleveland passed Ordinance No. 705-09, which provided the City's consent for the Project (in pertinent part) as follows:

> Whereas, this ordinance constitutes an emergency measure providing for the usual daily operation of a municipal department; now, therefore,
>
> Be it ordained by the Council of the City of Cleveland:
>
> Section 1.  That it is declared to be in the public interest that consent of the City of Cleveland is given to the Director of Transportation of the State of Ohio . . . to make the following improvements under the plans, specifications, and estimates approved by the Director of Transportation: to construct a new westbound IR-90 structure over the Cuyahoga River Valley north of the existing structure in the City of Cleveland (the 'Improvement').

---

[3] From their easterly boundaries, the parcels slope downward and are traversed by Greater Cleveland Regional Transit Authority ("RTA") train tracks.  Parcel 101-31-009 (the largest of the three parcels) is irregularly shaped and contains a northerly boundary that abuts West Eagle Avenue and a westerly boundary that abuts Canal Road. (Doc. No. 56-1 at PageID# 1166.)  Neither Parcel 101-13-014 nor 101-13-015 abut any other public roadway.  (*Id.*)

[4] The Innerbelt Bridge project was a $300 million project that involved the construction of two new bridges to carry traffic on I-90 through downtown Cleveland and "address[ed] operational, design, safety and access shortcomings that severely impact[ed] the ability of the Innerbelt freeway system to meet the transportation needs of northeast Ohio." See https://www.transportation.ohio.gov/wps/portal/gov/odot/projects/mega-projects/mega-projects/innerbelt. *See also* Oct. 15, 2020 Deposition of David Lastovka (Doc. No. 51-1) at Tr. 31.

Section 2. That the City gives it consent to the Improvement and its administration by the Director of Transportation, provided that this ordinance shall not be construed to impose any financial obligation on the City for the Improvement. The City agrees to assume and contribute 100% of the cost of any item, included in the construction contracts at the request of the City, which are determined by the Director of Transportation to be ineligible or unnecessary for the Improvement.

***

Section 4. That on completion of the Improvement, the City will maintain the rights-of-way and keep them free of obstructions in a manner satisfactory to the Department of Transportation and hold the rights-of-way inviolate for public highway purposes and permit no signs, posters, billboards, roadside stands or other private installations within the limits of the rights-of-way.

Section 5. (a) That all existing streets and public rights-of-way within the City necessary for the Improvement shall be made available for the Improvement. (b) That the City agrees that all rights-of-way required for the Improvement will be acquired and/or made available under current State and Federal regulations. The City also understands that right-of-way costs include eligible utility costs.

***

Section 6. That this Council requests the State to proceed with the Improvement.

***

(Doc. No. 56-7.)

The phase of the Project encompassing the construction of a new westbound Innerbelt Bridge was designated by ODOT as Construction Contract Group ("CCG1"). (Lastovka Decl. (Doc. No. 56-6) at ¶ 6.) As part of CCG1, ODOT planned to reconfigure or "repurpose" the intersection of Ontario Street and Carnegie Avenue in order to better connect that intersection with the new Innerbelt Bridge and create a safer environment for pedestrians. (Oct. 15, 2020 Lastovka Depo. (Doc. No. 51-1) at Tr. 6, 13; Lastovka Decl. (Doc. No. 56-6) at ¶ 11.) Specifically, ODOT determined that the best option would be to reconfigure the intersection by eliminating the existing turn lanes on Ontario Street and constructing a pedestrian walkway and plaza in their place. (Oct. 15, 2020 Lastovka Depo. (Doc. No.

51-1) at Tr. 13; Lastovka Decl. (Doc. No. 56-6) at ¶¶ 8-10.)  ODOT coordinated with the City of Cleveland and, indeed, Mr. Mavec testified that his Department reviewed ODOT's traffic engineering plans relating to the reconfiguration of this intersection.  (Oct. 30, 2019 Mavec Depo. (Doc. No. 25-4) at Tr.  18, 26; Oct. 15, 2020 Lastovka Depo. (Doc. No. 51-1) at Tr. 6; Oct. 13, 2020 Mavec Depo. (Doc. No. 55) at Tr. 75.)

Construction associated with the reconfiguration of the Ontario Street/Carnegie Avenue intersection began in 2012, with the pavement work associated with the pedestrian walkway/plaza completed and made available to the public by late 2012.  (Oct. 15 2020 Lastovka Depo. (Doc. No. 51-1) at Tr. 8–9; Lastovka Decl. (Doc. No. 56-6) at ¶ 12.)  Additional work (including landscaping) was done in early 2013 and was "substantially completed" by April 2013.  (Lastovka Decl. (Doc. No. 56-6) at ¶12.) ODOT performed the construction and landscaping work relating to the reconfiguration of the intersection, all of which was paid for by the State of Ohio.  (Oct. 30, 2019 Mavec Depo. (Doc. No. 25-4) at Tr. 31, 33, 41; Oct. 15, 2020 Lastovka Depo. (Doc. No. 51-1) at Tr. 17.)

Around that same time, ODOT released the Spring 2013 issue of its quarterly newsletter, "Construction Connection."  (Lastovka Dec. (Doc. No. 56-6) at ¶ 14; Doc. No. 56-6 at PageID#s 1208-1211.)  One of the topics covered in this newsletter was the "New Pedestrian Plaza at Carnegie and Ontario."  (Doc. No. 56-6 at PageID# 1208.)  Specifically, the newsletter explained (in relevant part) as follows:

> The intersection of Ontario Street and Carnegie Avenue serves as a popular meeting spot for Cleveland sports fans. In anticipation of the Tribe's sold-out home opener, crews worked hard to prepare this area for the 2013 Indians season.  The new pedestrian plaza features granite block pavers and curbs, similar to other locations downtown.  Throughout the rest of 2013, trees and plants will be added to the landscape – planted in the season best for the growth of each species.

> Improvements were made to the Ontario Street and Carnegie Avenue intersection as part of the innerbelt project with pedestrians in mind. The distance that pedestrians travel to cross the street was reduced by placing an island and medians at the intersection where foot traffic and bicycles can safely stop and wait for traffic.  ***

(*Id*.)  The first page of this newsletter also contained a picture of the intersection, showing the new pedestrian plaza.  (*Id*.)  On the last page, the newsletter explains that further information regarding the Project could be obtained by (1) visiting www.innerbelt.org and subscribing to ODOT's email list on the home page; (2) emailing ODOT directly at info@Innerbelt.org; (3) calling the Project Hotline; and (4) following the Project on Facebook and/or Twitter.  (*Id.* at PageID# 1211.)

It is undisputed that, as a result of the reconfiguration of the turn lanes into a pedestrian walkway/plaza, the easterly boundaries of MLO's Property no longer directly abut Ontario Street. (Oct. 30, 2019 Mavec Depo. (Doc. No. 25-4) at Tr. 32.)  Instead, MLO's Property now directly abuts the property consisting of the pedestrian walkway/plaza, which is roughly triangular in shape and is positioned between the eastern boundaries of MLO's Property and what is currently Ontario Street. It is also undisputed that MLO was not provided with formal notice regarding this reconfiguration by either the City of Cleveland or ODOT.  *See* Declaration of Harold LaPine (Doc. No. 87-5 at PageID#s 2088-2091) at ¶ 12; Declaration of Benjamin Cappadora (Doc. No. 87-6 at PageID#s 2116-2118) at ¶ 10.

In early 2015 (several years after the completion of the pedestrian walkway/plaza), MLO's owner and general manager Harold LaPine asked commercial real estate broker John Neely of Topline Partners to "try to sell [MLO's Property] and develop it."[5]  (LaPine Depo. (Doc. No. 52-1)

---

[5] The exact nature of the relationship between MLO and Mr. Neely and Topline Partners is unclear. While Mr. LaPine testified in deposition that he "engaged" Mr. Neely to market the Property, he subsequently submitted a Declaration in which he states that Mr. Neely "was not representing or working for MLO in this situation" but, rather, was an "independent developer who was allowed to pursue development on his own behalf." (LaPine Decl. (Doc. No. 87-5 at

at Tr. 12.) *See also* Deposition of John Neely (Doc. No. 49-1) at Tr. 16. To assist in his efforts to market the Property, Mr. Neely engaged the architectural firm of Bialosky & Partners (hereinafter "Bialosky") in September 2015 to provide (on an "if-come basis") a conceptual design for office/hotel space on the Property. (Neely Depo. (Doc. No. 49-1) at Tr. 18-21; Deposition of David Craun (Doc. No. 50-1) at Tr. 10 -14.) In October 2015, Bialosky furnished a series of drawings titled "Topline Partners Site Study," which depict potential project concepts for the Property. (Neely Depo. (Doc. No. 49-1) at Tr. 18-21; Neely Depo. Exhs. C, D, E (Doc. No. 49-1 at PageID#s 682-702).)) The Site Study clearly shows the existence of the pedestrian walkway and plaza. *See, e.g.*, Neely Depo. (Doc. No. 49-1) at PageID#s 687, 689, 695, 699. Several of the drawings in the Site Study contemplate vehicular access to the Property from West Eagle Avenue and Canal Road.[6] (Craun Depo. (Doc. No. 50-1) at Tr. 36, 41; Doc. No. 49-1 at PageID# 694.) Mr. Neely testified that, over the years, he contacted several potential buyers regarding the Property but did not receive any offers. (Neely Depo. (Doc. No. 49-1) at Tr. 32-34.)

In summer 2017, ODOT sued MLO to obtain a construction easement on the Property in order to repair the Lorain-Carnegie Bridge. (LaPine Decl. (Doc. No. 87-5 at PageID# 2089) at ¶ 6.) In mid-August 2017, Mr. LaPine and Mr. Cappadora (along with counsel) met with ODOT representatives at the Property to conduct a site visit. (*Id.* at ¶ 7.) According to MLO, the result of that meeting was that "ODOT realized they already had bridge access on their own property and did

---

PageID# 2090) at ¶¶ 16, 18-19.) The parties do not direct this Court to any evidence of a written contract between MLO (or any of its owners) and either Mr. Neely or Topline Partners that would help clarify this relationship. (Neely Depo. (Doc. No. 49-1) at Tr. 16-17.)

[6] Mr. LaPine and Mr. Cappadora both testified that they did not recall seeing Bialosky's Site Study for the Property, although Mr. LaPine indicated that some of the drawings therein "look[ed] familiar." (LaPine Depo. (Doc. No. 52-1) at Tr. 17; Deposition of Benjamin Cappadoro (Doc. No. 54-1) at Tr. 11-12.)

7

not need the MLO easement" and the parties subsequently entered into a settlement.[7]  (*Id*. at ¶ 8.)

After that meeting, Mr. LaPine, Mr. Cappadora, and their counsel drove around and up to the easterly

boundary of the Property.  (*Id*. at ¶ 9.)  Mr. LaPine and Mr. Cappadora aver that this was "the first

time . . . [that they] became aware that the city street that was abutting the property to the east . . . had

been completely removed and a park-walkway put in its place cutting off all access to the MLO

property."  (LaPine Decl. (Doc. No. 87-5 at PageID# 2089) at ¶ 9; Cappadora Decl. (Doc. No. 87-6

at PageID# 2117) at ¶ 9.)

Beginning in September 2018, counsel for MLO made several inquiries to the City of

Cleveland to determine (1) "under what authority, processes, or procedures the City had apparently

closed and eradicated Old Ontario [Avenue] for its entire length and installed a park and sidewalk;"

and (2) "how and by what means the City had undertaken to vacate, terminate access to, and/or

construct the existing park and sidewalk."  (Doc. No. 6 at ¶ 20.)  *See also* Doc. Nos. 6-2, 6-3, 6-4, 6-

6, 6-7.  Unsatisfied with the response, counsel for MLO sent a letter to then- City of Cleveland Law

Director Barbara Langhenry in November 2018, that included a public records request pursuant to

Ohio Rev. Code § 149.43 for certain documents relating to the reconfiguration of the Ontario

Street/Carnegie Avenue intersection.[8]  (Doc. No. 6-4.)  When it did not receive a response, MLO sent

follow-up letters to the City on December 4, 2018 and February 6, 2019.  (Doc. Nos. 6-6, 6-7.)

---

[7] *See also* Doc. No. 56-4; *Jolene M. Molitoris, Director, Ohio Dep't of Transportation v. Ontario Pointe, LLC, et al.,* Cuyahoga County Court of Common Pleas, Probate Division Case No. 2010 ADV 161339 (Judgment Entry dated May 2, 2011).

[8] Specifically, counsel for MLO requested documents relating to the following: "1.The alteration of the right of way of that part of Ontario St. which was/is:(a) Appurtenant to the above land on the westerly line of the right of way of Ontario; (b) Changed in use from a public street right of way to greenspace/park; (c) Specifically, but not as a limitation: (i) Any legislative or judicial abandonment or alteration/modification of said right of way; (ii) Any judicial taking by reason of eminent domain or otherwise; (iii) Any communication and/or interaction with any governmental agency. (Doc. No. 6-4 at p. 2.)

On February 13, 2019, City of Cleveland Chief Assistant Director of Law Richard Bertovich indicated that the City of Cleveland had responded to MLO's record request on December 7, 2018 and "determined there are no records that are responsive to your request."  (Doc. No. 6-8 at p. 2.)

## II.   Procedural History

On May 29, 2019, Plaintiff filed a Complaint in this Court against the City of Cleveland. (Doc. No. 1.)  Shortly thereafter, on July 8, 2019, Plaintiff filed a First Amended Complaint, in which it asserts claims for a declaratory judgment "that the confiscation of MLO's lawful rights to abut and use Old Ontario as a duly dedicated street is [a] violation of MLO's rights under the United States Constitution pursuant to 42 USC § 1983."  (Doc. No. 6 at ¶ 37, 40.)  Plaintiff asks the Court to "(i) order the City to promptly restore the Old Ontario right of way as set forth in the records of the City Engineer and Department of Streets to the condition existing at the date of confiscation;  (ii) to otherwise provide unrestricted  access, ingress and egress from the Property onto Old Ontario; (iii) temporarily and permanently enjoin and prohibit the City from any future confiscation of the Property; and (iv) award Plaintiff its attorney's fees, expenses and the costs of this proceeding."  (*Id.* at ¶ 37.)  Plaintiff also requests that the Court "(i) order the City to be temporarily and permanently enjoined from commencing and/or maintaining any eminent domain proceedings under State law or otherwise seeking to take or acquire the Property or otherwise remove unrestricted access, ingress and egress from the Property onto Old Ontario; and (ii) award MLO its attorney's fees, expenses, and the costs of this proceeding."  (*Id.* at ¶ 40.)

In the event that the Court "is unable to proceed to order or compel the restoration of Old Ontario by the City," Plaintiff asserts takings and due process claims against the City under 42 U.S.C.

§ 1983 for monetary damages in the amount of $4,500,000. (*Id.* at ¶¶ 41-47.) Lastly, Plaintiff seeks an award of punitive damages in the amount of $6,500,000. (*Id.* at ¶¶ 48-60.)

Defendant filed an Answer on July 29, 2019. (Doc. No. 10.) The Court conducted a Case Management Conference on August 26, 2019, at which time various case management deadlines were set. (Doc. No. 15.) Discovery proceeded over the following year, with the discovery and dispositive motions extended several times upon motion of the parties. *See, e.g.,* Doc. Nos. 22, 23, 32, 41, 44, 46, 47.

On March 19, 2021, Defendant filed a Motion for Summary Judgment with respect to all of Plaintiff's claims. (Doc. No. 56.) The parties then jointly requested an extension of time for the submission of Plaintiff's Brief in Opposition in order to allow Plaintiff to take several depositions. (Doc. No. 57.) Plaintiff thereafter filed its Brief in Opposition on May 21, 2021, to which Defendant replied on June 9, 2021. (Doc. Nos. 63, 65.) Plaintiff was then granted leave to file a "Supplemental Response" to Defendant's Reply on July 23, 2021. (Doc. Nos. 66, 68.) On July 30, 2021, Defendant sought leave to file, instanter, a Reply to Plaintiff's "Supplemental Response," which was granted.[9] (Doc. Nos. 73, 80.)

III. **Standard of Review**

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any

---

[9] On January 6, 2022, Plaintiff filed a Motion for Settlement Conference. (Doc. No. 75.) On January 14, 2022, Defendant filed a response indicating that the City was willing to participate in private mediation to resolve the instant action. (Doc. No. 81.) The Court then granted Plaintiff's Motion, ordered the parties to complete mediation by no later than March 1, 2022, and cancelled the Trial that was then-set for March 7, 2022. The deadline for completing mediation was extended several times on motion of the parties. On March 25, 2022, the parties advised that they had not been able to resolve the instant proceedings at the mediation which took place on March 18, 2022. (Doc. No. 85.)

material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A dispute is 'genuine' only if based on evidence upon which a reasonable jury could return a verdict in favor of the non-moving party."  *Henderson v. Walled Lake Consol. Sch*., 469 F.3d 479, 487 (6th Cir. 2006).  "Thus, 'the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.'"  *Cox v. Kentucky Dep't of Transp*., 53 F.3d 146, 150 (6th Cir. 1995) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).  A fact is "material" only "if its resolution might affect the outcome of the suit under the governing substantive law."  *Henderson*, 469 F.3d at 487.

At the summary judgment stage, "[a] court should view the facts and draw all reasonable inferences in favor of the non-moving party."  *Pittman v. Experian Info. Solutions, Inc.,* 901 F.3d 619, 628 (6th Cir. 2018).  In addition, "the moving party bears the initial burden of showing that there is no genuine dispute of material fact."  *Ask Chems., LP v. Comput. Packages, Inc*., 593 Fed. Appx 506, 508 (6th Cir. 2014).  The moving party may satisfy this initial burden by "identifying those parts of the record which demonstrate the absence of any genuine issue of material fact."  *Lindsey v. Whirlpool Corp*., 295 Fed. Appx 758, 764 (6th Cir. 2008).  "[I]f the moving party seeks summary judgment on an issue for which it does not bear the burden of proof at trial," the moving party may also "meet its initial burden by showing that 'there is an absence of evidence to support the nonmoving party's case.'"  *Id*. (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).  Once the moving party satisfies its burden, "the burden shifts to the non-moving party who must then point to evidence that demonstrates that there is a genuine dispute of material fact for trial."  *Ask Chems*., 593 Fed. Appx at 508-09.  "[T]he nonmoving party may not simply rely on its pleading, but must 'produce evidence that results in a conflict of material fact to be solved by a jury.'"  *MISC Berhad v.*

11

*Advanced Polymer Coatings, Inc*., 101 F. Supp. 3d 731, 736 (N.D. Ohio 2015) (quoting *Cox,* 53 F.3d at 150).

IV.     **Analysis**

     A.     **Statute of Limitations**

     Defendant first argues that Plaintiff's claims should be dismissed because they are barred by the statute of limitations.  (Doc. No. 56 at pp. 16-22.)  Specifically, Defendant maintains that Plaintiff's § 1983 takings and due process claims are governed by the two-year statute of limitations set forth in Ohio Rev. Code § 2305.10(A) and that the limitations period began to run by no later than April 8, 2013, the latest date on which the pedestrian walkway and plaza were completed and open to the public.  (*Id*. at pp. 16-18.)  Defendant asserts that Plaintiff was, therefore, required to file its § 1983 claims by no later than April 8, 2015.  (*Id*. at p. 18.)  Because Plaintiff did not file its Complaint until May 29, 2019, Defendant argues that all of Plaintiff's § 1983 claims are time-barred and should be dismissed as a matter of law.  (*Id*.)

     In response, Plaintiff first argues that its claims are governed by the four-year statute of limitations set forth in Ohio Rev. Code § 2305.09(E) rather than the two-year limitations period in § 2305.10(A).  (Doc. No. 63 at p. 18.)  Plaintiff next argues that the running of the limitations period should not begin to run until August 2017, when Mr. LaPine and Mr. Cappadora first learned of the construction of the pedestrian walkway/plaza.  (*Id*. at p. 18-19.)  Plaintiff asserts that it could not reasonably have discovered that the Property no longer directly abutted Ontario Street in April 2013 because neither Defendant nor ODOT ever provided any written notice to MLO of the reconfiguration of the Ontario/Carnegie intersection.  (*Id*.)  Plaintiff further maintains that Defendant's argument should be rejected because it is "based upon the proposition that that one or both of MLO's nearly 90

12

year old semi-retired principals who reside in Moreland Hills and Hunting Valley would somehow find and follow ODOT websites and/or make ORC 149.43 requests to ODOT; and, intentionally brave the 6+ years of downtown construction chaos, street closures, re-routings, etc.; to regularly 'see if' the massive Innerbelt-Bridge project had somehow impacted MLO's property." (*Id*. at p. 3.)

The parties, then, disagree over both the correct limitations period (two years vs. four years) and the date on which the limitations period begins to run. The Court will address these issues separately, below.

### 1.    Limitations Period for § 1983 claims in Ohio

As the Sixth Circuit has explained, "Section 1983 does not provide a statute of limitations, so we must borrow one from the most analogous state cause of action." *3799 Mill Run Partners, LLC v. City of Hilliard, Ohio*, 839 Fed. Appx. 948, 950 (6th Cir. 2020).  The Supreme Court has explained that statutes of limitations for § 1983 actions are borrowed from state law, but that the question of how to characterize § 1983 actions to determine the most analogous state statute of limitations is a question of federal law.  *See Wilson v. Garcia*, 471 U.S. 261 (1985), *partially superseded by statute as stated in Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 377-380 (2004).  In *Wilson v. Garcia, supra,* that Court determined that the proper limitations period for a § 1983 action is the limitations period for personal injury actions in the state in which the § 1983 claim arises.  *Id*.  Several years later, in *Owens v. Okure*, 488 U.S. 235 (1989), the Supreme Court further clarified that when a state has multiple statutes of limitations for different categories of personal injury actions, the residual personal injury statute of limitations applies.

Following these decisions, the Sixth Circuit held that the "limitations period for § 1983 actions arising in Ohio is the two-year period in Ohio Revised Code ('O.R.C.') § 2305.10." *Browning v.*

*Pendleton*, 869 F.2d 989 (6th Cir. 1989).  Since then, courts have routinely held that, in Ohio, §
2305.10 is the appropriate statute of limitations in § 1983 cases, including in cases involving takings
and due process claims.  *See 3799 Mill Run Partners, LLC*, 839 Fed. Appx. at 950 ("Thus, for § 1983
actions brought in Ohio, we have applied the state's two-year statute of limitations for personal injury
actions."); *LRL Properties v. Portage Metro Housing Auth*., 55 F.3d 1097, 1105 (6th Cir. 1995)
(explaining that the Sixth Circuit "squarely addressed this issue in *Browning v. Pendleton*, 869 F.2d
989 (6th Cir. 1989) and definitively held that "the appropriate statute of limitations for 42 U.S.C. §
1983 civil rights actions arising in Ohio ... requires that actions ... be filed within two years after their
accrual."); *Kuhnle Brothers, Inc. v. County of Geauga*, 103 F.3d 516, 519 (6th Cir. 1997); *Banks v.
City of Whitehall*, 344 F.3d 550, 553-554 (6th Cir. 2003).  *See also Boggs v. City of Cleveland*, 2021
WL 2188794 at * 4-6 (N.D. Ohio May 28, 2021); *Jacks v. City of Youngstown*, 2021 WL 3288572 at
* 6-8 (N.D. Ohio Aug. 2, 2021); *Woods Cove, III, LLC v. City of Akron*, 2018 WL 4104186 at * 8-9
(N.D. Ohio Aug. 29, 2018), *overruled on other grounds by, Knick v. Township of Scott, Pennsylvania*,
139 S. Ct. 2162 (2019).

Citing the above authority, Defendant argues that the two-year limitations period in Ohio Rev.
Code § 2305.10 applies to Plaintiff's § 1983 takings and due process claims.  (Doc. No. 56 at pp. 16-
22.)  In opposition, Plaintiff asserts (without any citation to any legal authority) that the four-year
statute of limitations in Ohio Rev. Code § 2305.09(E) applies.  That section provides that "an action
for any of the following causes shall be brought within four years after the cause thereof accrued: ***
(E) For relief on the grounds of a physical or regulatory taking of real property." (Doc. No. 63 at p.
18.)

14

Although cited by neither party, the Court notes that, in *McNamara v. City of Rittman*, 473 F.3d 633 (6th Cir. 2007), the Sixth Circuit suggested, in dicta, that the four-year limitations period in Ohio Rev. Code § 2305.09(E) would apply to takings claims brought after 2004, explaining as follows:

> In 2004, the Ohio legislature added a time-limitation provision in actions "[f]or relief on the grounds of a physical or regulatory taking of real property." Ohio Rev. Code § 2305.09(E). This new limitations period is four years, not two. Thus, any takings actions brought after 2004 should follow the four-year time bar, and this could be relevant to any continuing violations actions plaintiffs may wish to bring in the future, as discussed in Part II–B of this opinion. However, as to the original action brought by the plaintiffs and dismissed by the state and district courts on statute of limitations grounds, the two-year limit properly applies.

*Id*. at fn 1.

For the following reasons, however, the Court finds that the two-year limitations period set forth in Ohio Rev. Code § 2305.10 applies to Plaintiff's § 1983 takings and due process claims. As an initial matter, the language set forth above in *McNamara* is dicta, as the parties in that case had agreed that the applicable limitations period in that case was two years and a determination of whether § 2304.09(E) applied was not necessary to the determination of the issue on appeal. *See McNamara*, 472 F.3d at 637; *Freed v. Thomas*, 976 F.3d 729, 738 (6th Cir. 2020) (noting that "dictum is anything 'not necessary to the determination of the issue on appeal.'") (quoting *United States v. Swanson*, 341 F.3d 524, 530 (6th Cir. 2003)).

Moreover, several district courts within this Circuit have rejected the above language in *McNamara* and continued to rely on the two-year statute of limitations in Ohio Rev. Code § 2305.10 for post-2004 takings claims brought pursuant to § 1983. In *Woods Cove, III, supra*, for example, another judge in this District rejected the argument that the four-year limitations period in §2305.09(E) applied, despite the plaintiff's reliance on *McNamara*. That court explained as follows:

15

The City argues that, as to 13 of the properties at issue, because this lawsuit was filed on April 27, 2016, all of the § 1983 causes of action in Counts I, II, and III that accrued prior to April 27, 2014 are time-barred by the two-year statute of limitations. (Def. Mot. at 370-71, citing cases.)

In opposition, plaintiffs assert that the four-year statute of limitations in Ohio Rev. Code § 2305.09 "applie[s] to takings claims under Ohio law[.]" (Pl. Opp'n at 466, citing *McNamara v. City of Rittman*, 473 F.3d 633, 637 n.1 (6th Cir. 2007) [fn 24].) But § 1983 claims are not taking claims; they are personal injury claims. *Banks v. City of Whitehall*, 344 F.3d 550, 553 (6th Cir. 2003) ("section 1983 claims [are] best characterized as tort actions for the recovery of damages for personal injuries and federal courts must borrow the statute of limitations governing personal injury actions in the state in which the section 1983 action was brought.") (citing *Wilson*, 471 U.S. at 275-76; *Owens v. Okure*, 488 U.S. 235, 109 S. Ct. 573, 102 L.Ed. 2d 594 (1989); *Browning v. Pendleton*, 869 F.2d 989 (6th Cir. 1989)). In *Banks*, the court of appeals noted that it has "squarely rejected attempts to get around" the two-year statute of limitations. *Id.* (citing *LRL Props. v. Portage Metro Housing Auth.*, 55 F.3d 1097, 1105 (6th Cir. 1995) (rejecting application of Ohio Rev. Code § 2305.09); *Kuhnle Bros., Inc. v. Cty. of Geauga*, 103 F.3d 516, 519-20 (6th Cir. 1997) (same)).

Accordingly, a two-year statute of limitations applies and, based on unrefuted demolition dates identified in Table P-1 and shown parenthetically below, all § 1983 claims relating to the following properties are time-barred because they accrued outside the two-year period preceding the filing of the complaint.

*Woods Cove, III, LLC*, 2018 WL 4104186 at *8.  In a footnote, the court further explained:

Plaintiff's reliance upon dicta in *McNamara* suggesting a four-year statute of limitations for "takings actions brought after 2004" is likely misplaced. In *Wilson v. Garcia*, 471 U.S. 261, 274, 105 S. Ct. 1938, 85 L.Ed. 2d 254 (1985), the Court expressly rejected any suggestion that "the choice of the statute of limitations [should] depend upon the particular facts or the precise legal theory of each [§ 1983] claim[.]" The Court "conclude[d] that [§ 1983] is fairly construed as a directive to select, in each State, the one most appropriate statute of limitations for all § 1983 claims." *Id.* at 275 (emphasis added).

*Id.* at fn 24.  Following suit, several other judges in this District have recently rejected arguments that the four-year limitations period set forth in § 2305.09(E) applies to § 1983 takings and due process claims.  *See Boggs*, 2021 WL 2188794 at * 4-6 (rejecting plaintiffs' reliance on *McNamara* and finding that two-year limitations provision in § 2305.10 applied); *Jacks*, 2021 WL 3288572 at * 6

16

(applying two-year limitations period set forth in § 2305.10 to plaintiff's § 1983 takings and due process claims).

Here, the Court rejects Plaintiff's argument that the four-year limitations provision in § 2305.09(E) applies to its §1983 takings and due process claims. Plaintiff has cited no case in which any federal court (either the Sixth Circuit or a district court) has actually applied the limitations period in § 2305.09(E) to a § 1983 claim. Nor has it articulated any compelling justification or reasoning as to why it should be applied, particularly in light of the Supreme Court's observation in *Wilson* that the choice of the statute of limitations should not depend upon the particular facts or the precise legal theory of each § 1983 claim. *Wilson*, 471 U.S. at 274.[10] Rather, courts should use a state's residual or general personal injury statute of limitations for § 1983 claims. *See Owens v. Okure*, 488 U.S. 235 (1989) (holding that when a state has multiple statutes of limitations for different categories of personal injury actions, the residual personal injury statute of limitations applies). In Ohio, that statute is Ohio Rev. Code § 2305.10. *See Browning*, 869 F.2d at 992; *Kuhnle Brothers, Inc.*, 103 F.3d at 519; *Banks,* 344 F.3d at 553-554.

Accordingly, the Court finds that the two-year limitations period set forth in Ohio Rev. Code § 2305.10 applies to Plaintiffs' § 1983 claims herein.

---

[10] In *Wilson*, the Supreme Court explained as follows: "[P]ractical considerations help to explain why a simple, broad characterization of all § 1983 claims best fits the statute's remedial purpose. The experience of the courts that have predicated their choice of the correct statute of limitations on an analysis of the particular facts of each claim demonstrates that their approach inevitably breeds uncertainty and time-consuming litigation that is foreign to the central purposes of § 1983." *Id*. at 272. Accordingly, the Court concluded that "the statute is fairly construed as a directive to select, in each State, the *one* most appropriate statute of limitations for all 1983 clams." *Id.* at 275 (emphasis added).

### 2. Accrual Date

The next question the Court must decide is when the limitations period begins to run.  The question of when the statute of limitations begins to run is governed by federal law.  *Ruff v. Runyon*, 258 F.3d 498, 500 (6th Cir. 2001).  *See also Dibrell v. City of Knoxville, Tennessee,* 984 F.3d 1156, 1162 (6th Cir. 2021).  The Sixth Circuit recently discussed this issue in the context of a §1983 claim in *Dibrell*, *supra*, as follows:

> Although the statute of limitations turns on state law, the question of when a § 1983 claim accrues to trigger the statute turns on federal law.  *Wallace*, 549 U.S. at 388, 127 S.Ct. 1091. The "standard" accrual "rule" for federal claims starts the limitations period "when the plaintiff has a complete and present cause of action" that can be raised in court. *Rotkiske v. Klemm*, —— U.S. ——, 140 S.Ct. 355, 360, 205 L.Ed.2d 291 (2019) (quoting *Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 545 U.S. 409, 418, 125 S. Ct. 2444, 162 L.Ed.2d 390 (2005)). The Supreme Court has contrasted this "standard" rule with a "discovery" rule that ties the start of the limitations period to when the plaintiff discovered (or should have discovered) the cause of action. *Id*. at 360–61. Any presumption favoring that discovery rule, the [Supreme] Court recently clarified, represents a "bad wine of recent vintage." *Id*. at 360 (quoting *TRW Inc. v. Andrews*, 534 U.S. 19, 37, 122 S.Ct. 441, 151 L.Ed.2d 339 (2001) (Scalia, J., concurring in the judgment)).
>
> In this § 1983 context, the [Supreme] Court has started its accrual analysis with the standard rule: that a claim accrues when the plaintiff has a complete cause of action. *McDonough*, 139 S. Ct. at 2155; *Wallace*, 549 U.S. at 388, 127 S.Ct. 1091.  Our § 1983 caselaw, by contrast, has started the accrual analysis with the competing discovery rule: that the claim accrues when the plaintiff knows of, or should have known of, that cause of action. *See King v. Harwood*, 852 F.3d 568, 578 (6th Cir. 2017); *Johnson,* 777 F.3d at 843.

*Dibrell*, 984 F.3d at 1161-1162.  The Sixth Circuit then wondered whether "our cases imbibing this 'bad wine' warrant reconsideration in light of the Supreme Court's recent teachings." *Id*. at 1162.  Ultimately, however, that court decided it "need not resolve this tension now" because, in that particular case, the plaintiff's claims would be untimely under either the standard rule or the discovery rule. *Id*.

18

The same is the case here.  For the following reasons, the Court finds that, under either the standard rule or the discovery rule, Plaintiff's § 1983 claims are time-barred.

As noted above, under the standard rule, the limitations period starts to run "when the plaintiff has a complete and present cause of action" that can be raised in federal court.  *Dibrell*, 984 F.3d at 1162 (quoting *Rotkiske*, 140 S. Ct. at 360.)  In takings claims under § 1983, the Supreme Court has held that "a government violates the Takings Clause when it takes property without compensation, and … a property owner may bring a Fifth Amendment claim under 1983 at that time." *Knick*, 139 S. Ct. at 2177.  *See also id*. at 2170 ("[A] property owner has a Fifth Amendment entitlement to compensation as soon as the government takes his property without paying for it.")

Here, it is undisputed that the pavement work associated with the pedestrian walkway/plaza was completed and made available to the public by late 2012.  (Oct. 15, 2020 Lastovka Depo. (Doc. No. 51-1) at Tr. 9; Lastovka Decl. (Doc. No. 56-6) at ¶ 12.)  Additional work (including landscaping) was done in early 2013 and was "substantially completed" by April 2013.  (Lastovka Decl. (Doc. No. 56-6) at ¶ 12.)  Thus, the Court finds that Plaintiff had a "complete and present cause of action" that could be raised under the Takings Clause in federal court by no later than April 2013.  Under the standard accrual rule, Plaintiff had two years from that date (i.e., until April 2015) to file its takings claim.  As Plaintiff did not file its Complaint until May 2019, Plaintiff's § 1983 takings claim was filed over four years late and is clearly time-barred.

The same analysis applies to Plaintiff's due process claim.  Plaintiff alleges that the City deprived it of a right to property without due process of law when it eliminated the former turn lanes on Ontario Street and constructed the pedestrian walkway/plaza in its place.  Like Plaintiff's takings claim, the Court finds Plaintiff had a complete and present cause of action with respect to its due

process claim by no later than April 2013.  Under the standard accrual rule, therefore, Plaintiff had two years from that date (i.e., until April 2015) to file its due process claim.  Plaintiff did not file its Complaint until May 2019 and, thus, its § 1983 due process claim is also clearly time-barred.

The Court reaches the same result under the "discovery" rule.  Under this rule, the statute of limitations "does not begin to run until the plaintiff knows or *has reason to know*" of the injury that is the basis of the action.  *King v. Harwood*, 852 F.3d 568, 578 (6th Cir. 2017) (emphasis added) (quoting *Eidson v. State of Tenn. Dept. of Children's Servs*., 510 F.3d 631, 635 (6th Cir. 2007)).  "A plaintiff has reason to know of his injury when he should have discovered it through the exercise of reasonable diligence."  *Roberson v. Tennessee*, 399 F.3d 792, 794 (6th Cir. 2005).  "Courts have taken a common-sense approach to this task, inquiring as 'to what event should have alerted the typical lay person to protect his or her rights.'"  *Id*. (quoting *Hughes v. Vanderbilt Univ*., 215 F.3d 543, 548 (6th Cir. 2000)).  As the Sixth Circuit recently explained, this is an objective inquiry.  *See Miller v. Cocke County, Tennessee,* 2022 WL 103143 at * 2 (6th Cir. Jan. 11, 2022).

Here, the Court agrees with Defendant that Plaintiff had reason to know of the injury that is the basis of both its takings and due process claims (i.e., the elimination of the turn lanes on Ontario Street and construction of the pedestrian walkway/plaza) by no later than April 2013.[11]  As discussed *supra*, the Innerbelt Bridge project was a highly publicized project.  Among other things, ODOT Project Manager David Latosvka testified that, over the course of the Project, ODOT conducted "hundreds of public meetings" regarding the status of construction.  (Oct. 15, 2020 Latovska Depo.

---

[11] The fact that Mr. LaPine and Mr. Cappadora were not actually aware of the construction of the pedestrian walkway/plaza until August 2017 is not determinative.  As noted above, under the discovery rule, the statute of limitations "does not begin to run until the plaintiff knows *or has reason to know*" of the injury that is the basis of the action.  *King,* 852 F.3d at 578 (emphasis added).

20

(Doc. No. 51-1) at Tr. 22; May 12, 2021 Latosvka Depo. (Doc. No. 78-1) at Tr. 50, 61.) In addition, ODOT maintained a website dedicated to the Project, issued quarterly newsletters regarding the status of the Project, and maintained an "extensive shareholder and email list" that had "over 10,000 people on it." (*Id*.) *See also* Doc. No. 56-6 at PageID# 1211. Of particular note, in Spring 2013, ODOT issued its quarterly newsletter, "Construction Connection," which specifically covered the "New Pedestrian Plaza at Carnegie and Ontario." (Doc. No. 56-6 at PageID# 1208.) This newsletter contained both a picture of the intersection showing the new pedestrian plaza, as well as a written description of the changes to the intersection at Carnegie and Ontario. (*Id*.) The last page of the newsletter provided several ways to contact ODOT to obtain further information, including subscribing to the email list, emailing ODOT directly, and calling the Project Hotline. (*Id*. at PageID# 1211.)

Plaintiff's Property is located at the corner of Ontario and Carnegie. Plaintiff asserts that, because of this "highly visible"[12] and central location, its undeveloped Property was valued at $1.9 million dollars prior to the construction of the pedestrian walkway/plaza. (James Huber Expert Report (Doc. No. 88-3) at p. 1.) The Court finds that, as the owner of valuable real property located in midst of a massive, highly publicized, ongoing construction project, Plaintiff should have discovered, through the exercise of reasonable diligence, the elimination of the turn lanes on West Ontario and construction of the pedestrian plaza in its place, by no later than April 2013. The commencement of the Innerbelt Bridge Project in such close proximity to Plaintiff's Property should have alerted Plaintiff to the possibility that its Property could be impacted. Plaintiff fails to

---

[12] Mr. Cappadora testified that the Property has "great visibility." (Cappadora Depo. (Doc. No. 54-1) at Tr. 13-14.) Mr. LaPine similarly testified that he bought the property because "the location is fantastic." (LaPine Depo. (Doc. No. 52-1) at Tr. 18.)

sufficiently explain why it could not have either attended any of the public meetings relating to the Project, studied the Project website, and/or subscribed to the Project email distribution list. Notably, had Plaintiff subscribed to the email distribution list, it would have received a copy of the Spring 2013 Construction Connection newsletter which prominently displaced pictures of the reconstructed intersection of Carnegie and Ontario where Plaintiff's Property is located. This would certainly have "alerted the typical lay person of the need to protect his rights" relative to the Property at issue.

Plaintiff nonetheless argues that it is unreasonable to expect it to have ferreted out this information from the ODOT website given that, at all relevant times, Mr. Cappadora and Mr. LaPine were nearly 90 years old, semi-retired, and, thus, apparently not as familiar with technology and the skills necessary to find this information. The Court rejects this argument. As an initial matter, the reasonable diligence inquiry is an objective inquiry that asks what event would have alerted the "typical or average lay person." *See Miller,* 2022 WL 103143 at * 2. It is not an inquiry into whether it was subjectively reasonable to expect Plaintiff's two elderly co-owners to have been able to find and locate information regarding the impact of the Project on their Property.

Even taking into account the age of Plaintiff's co-owners, however, the Court finds Plaintiff's argument to be without merit. Plaintiff's co-owners (Mr. Cappadora and Mr. LaPine) are sophisticated businessmen. Mr. Cappadora testified that he had "been in the real estate business for almost 70 years" and has had ownership interests in several properties in downtown Cleveland over the years. (Cappadora Depo. (Doc. No. 54-1) at Tr. 6-7.) Mr. LaPine testified that he was in the trucking business for 30 years, after which he got involved in the real estate business. (LaPine Depo. (Doc. No. 52-1) at Tr. 6.) Mr. LaPine has had an ownership interest in the Property at issue since approximately 1997 and also owns other properties as well. (Cappadora Depo. (Doc. No. 54-1) at

Tr. 8; LaPine Depo. (Doc. No. 52-1) at Tr. 6, 10-11.)  As Plaintiff's co-owners were sophisticated businessmen with extensive experience in the real estate industry, the Court rejects the argument that they should not reasonably have been expected to discover the impact of the Project on their Property prior to their site visit in August 2017.[13]

Accordingly, the Court finds that Plaintiff should have discovered, through the exercise of reasonable diligence, the elimination of the turn lanes on West Ontario and construction of the pedestrian plaza, by no later than April 2013.  Thus, under the discovery rule, Plaintiff had two years from that date (i.e., until April 2015) to file its takings and due process claims.  Plaintiff did not file its Complaint until May 2019 and, thus, its § 1983 claims are clearly time-barred.

Lastly, the Court notes that Plaintiff's § 1983 claims would be time-barred even if the four-year limitations period in Ohio Rev. Code § 2305.09(E) applied.  As set forth above, under both the standard and discovery accrual rules, the statute of limitations began to run by no later than April 2013.  Assuming a four-year limitations period, Plaintiff would have had to file its Complaint by April 2017.  Because Plaintiff did not file its Complaint until May 2019, its § 1983 takings and due process claims would be untimely even assuming that Ohio Rev. Code § 2305.09(E) applied.

Therefore, and for all the reasons set forth above, the Court finds that Plaintiff's § 1983 takings and due process claims are time-barred.  Defendant's Motion for Summary Judgment is granted.

---

[13] The Court also notes that Mr. LaPine testified that he goes to Cleveland Indians games at Progressive Field every year. (LaPine Depo. (Doc. No. 52-1) at Tr. 20-21.)  Progressive Field is located directly across the street from the Property at issue.

23

**V.     Conclusion**

For the foregoing reasons, Defendant City of Cleveland's Motion for Summary Judgment (Doc. No. 56) is GRANTED.

**IT IS SO ORDERED.**


                                                         *s/Pamela A. Barker*
                                                         PAMELA A. BARKER
Date:  March 31, 2022                                     U. S. DISTRICT JUDGE

24